UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| WYNETTA ARNOLD, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | No. 3:20-cv-01031 |
| TENNESSEE DEPARTMENT OF CORRECTIONS, | ) |  |
| Defendant. | ) |  |

## MEMORANDUM OPINION

On August 19, 2019, Wynetta Arnold stopped at a convenience store immediately after her shift at DeBerry Special Needs Facility ("DSNF"), a prison operated by the Tennessee Department of Corrections ("TDOC"). There, she found an envelope at the counter. But rather than hand it into one of the store's clerks, Arnold pocketed it, and, when she opened the envelope in her car, she discovered that it was filled with cash. Instead of turning the envelope over to the police or the store clerks, she kept it. Unfortunately for Arnold, who was still in her TDOC uniform, the store caught her on camera, and, the following morning, DSNF's Warden saw the video and decided to terminate Arnold's employment. This was not the first time a corrections officer had been caught on camera taking items that did not belong to them from a store. Another officer had under-rung groceries while in TDOC-issued clothing. However, unlike Arnold, he was not fired, and, unlike Arnold, he was a man and white. Now, TDOC moves for summary judgment, arguing that Arnold's Title VII claims must fail because Arnold cannot prove that she was treated differently than similarly-situated non-black, non-female corrections officers or that TDOC's stated reasons for firing her were pretextual. For the following reasons, TDOC's Motion for Summary Judgment (Doc. No. 42) will be denied.

I.  **FACTUAL ALLEGATIONS AND BACKGROUND**[1]

On August 19, 2019, Correctional Corporal[2] Wynetta Arnold finished her shift at DSNF and, while still in uniform, stopped at a Kwik Sak convenience store to pick up something to eat. (Doc. No. 49 at ¶¶ 2, 4, 6–7). At the counter, Arnold found an envelope. (Doc. No. 49 at ¶ 8). According, to Arnold, the store clerks "were bickering" and there were no other customers in the store to whom the envelope might belong. (Doc. No. 52 at ¶ 60). When Arnold opened the envelope in her car, she discovered it contained cash. (Doc. No. 49 at ¶ 10). Instead of returning the cash to where she found it, Arnold decided that she would turn it over to the police, and, if it went unclaimed, hoped to keep it. (Doc. No. 52 at ¶ 61). But it was late, so Arnold chose to delay the task until the following morning. (Id.). That morning, Arnold overslept and did not return the cash before going to work. (Id.).

Unbeknownst to Arnold, the Kwik Sak's security camera caught her taking the envelope from the store's counter, and the envelope's owner, Ron'Dayshia Newsom, returned to the store. (Doc. No. 49 at ¶ 9). Newsom was shown the footage, recorded it on her phone, and posted the video to Facebook.[3] (Doc. No. 49 at ¶¶ 9, 11–12). There, a comment identified the person in the video as "Arnold. Works at Deberry Special Needs Prison." (Doc. No. 49 at ¶ 13). Newsom forwarded the video to TDOC Institutional Investigator Kelly Hunt, and TDOC's Office of Investigation and Compliance began to investigate the incident. (Id. at ¶ 14).

---

[1] The facts in this section are undisputed unless specifically noted otherwise and are drawn from the undisputed portions of the parties' statements of facts (Doc. Nos. 49, 52), the exhibits, depositions, and declarations submitted in connection with the summary judgment briefing that are not contradicted by the evidence in the record.
[2] Arnold was promoted to Correctional Corporal at DSNF that year, and, although she had worked at DSNF since 2017, she was placed on probation within this new role. (Doc. No. 49 at ¶¶ 2, 4–5).
[3] The video was taken down from Facebook that same day. (Doc. No. 49 at ¶ 12).

2

DSNF Warden James Holloway was told to watch the video when he arrived at work, and after doing so,[4] he made the unilateral decision to terminate Arnold's employment.[5] (Doc. No. 49 at ¶¶ 18–19). When he explained his decision to Arnold, Warden Holloway stated that the termination was "based on a store security video that recently surfaced on the Facebook page of a private citizen that shows [Arnold], in full correctional uniform, taking notice of something on the counter beside [Arnold] before sliding it off the counter and putting it in pocket rather than reporting the item to the cashier." (Doc. No. 49 at ¶ 21). He later testified that his decision to terminate Arnold's employment was based on the video, specifically stating that "she was in a correction officer uniform taking something that didn't belong to her." (Doc. No. 52 at ¶ 63). Warden Holloway also emphasized that video called both Arnold's and TDOC's integrity into question and was available to inmates. (Doc. No. 52 at ¶ 65).

Arnold's termination letter offers a slightly different explanation for her firing. It states that Arnold was fired for violating TDOC Policy 302.08, which requires all employees to strictly adhere to TDOC's Oath and Code of Conduct. (Doc. No. 49 at ¶ 23; Doc. No. 45-13 at 122–23). However, neither party offers either evidence or argument for which provisions of the Code of Conduct or Oath apply. The only seemingly applicable portion of the either the Code of Conduct or the Oath appears in the last provision of the Code of Conduct, which reads as follows:

> Illegal activities on the part of any employee, in addition to being unlawful, reflect on the integrity of the department and betray the trust and the confidence placed in state employees by the public. It is expected that employees shall obey all laws while engaged in official or personal activities. Should an employee be charged with, arrested for, or convicted of any felony or misdemeanor, the

---

[4] No record evidence establishes whether Warden Holloway knew about the OIC investigation when he saw the video.
[5] At all relevant times, Warden Holloway possessed sole authority to fire employees at the facility. (Doc. No. 49 at ¶ 20).

> employee must immediately notify their supervisor and provide a written report to the warden . . . as applicable.

(Doc. No. 45-13 at 2). Arnold's termination letter goes on to state that she was fired based on TDOC Policy 302.06. (Doc. No. 49 at ¶ 23; see also Doc. No. 43 at 14 ("Her termination was carried out under the Policy [302.06]")). But the applicability of Policy 302.06 is highly suspect; it outlines the "policy of the TDOC to investigate the circumstances surrounding the arrest, indictment, and/or conviction of an employee to determine if disciplinary action is appropriate," (Doc. No. 45-13 at 4), and there is no record evidence that Arnold had been arrested, indicted, or convicted of any crime.

In May 2020, Arnold filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") claiming that she was discriminated against based on her race and sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). (Doc. No. 49 at ¶¶ 24–25). However, the EEOC decline to pursue her case. (Doc. No. 49 at ¶ 29). Therefore, on December 1, 2020, Arnold filed this case to vindicate her claims. Specifically, Arnold argues that she was treated less favorably than two other DSNF employees, Correctional Officer Michael Hatfield and Correctional Captain Frederick Estes.[6] (Doc. No. 49 at ¶ 33).

The first, Hatfield, is a white man. On April 23, 2018, Hatfield was caught and admitted to under-ringing $4.96 worth of tuna at a Wal-Mart. (Doc. No. 49 at ¶¶ 36–37). According to Wal-Mart's report on the incident, Hatfield was TDOC uniform at the time. (Doc. No. 50-8 at 10). Soon after the incident, a brief article appeared on the website Scoop: Nashville titled, "TDOC Correctional Officer Trespassed from Wal-Mart for Theft." (Doc. No. 52 at ¶ 66). The article included a graphic that contained a picture of Hatfield and identified him as a TDOC Correctional Officer. According to the article:

---

[6] A Correctional Corporal (Arnold's rank) is above a Correctional Officer but below a Correctional Captain. (Doc. No. 49 at ¶¶ 35, 48)

4

> Michael Hatfield was found to be under-ringing merchandise at the self-checkout at Walmart on Monday and this wasn't the first time he had been observed doing so. While Monday's incident was under the dollar limit for Walmart to prosecute for shoplifting, he was formally trespassed from the store by Ashland City PD. A tipster tells Scoop: Nashville that Hatfield may face actual theft charges once video of previous incidents is reviewed now that his identity is known. According to records published by the Tennessee Department of Corrections, Michael Hatfield is a full-time Correctional Officer with the State of Tennessee and makes just over $38,000 per year.

(Doc. No. 52 at ¶ 66). Soon after the article was published, someone anonymously slipped a copy of the article under the Warden's door. (Doc. No. 49 at ¶ 40). According to Holloway, he intended to speak to Hatfield about the incident to "know if there was anything to it." (Doc. No. 50-5 at 14). However, a few days after Holloway was given the article, Hatfield—who had continued to work—suffered an apparent mental breakdown. (Doc. No. 52 at ¶ 69). Hatfield was then placed on extended leave and did not return to work for several months. (Id. at ¶¶ 69–70). When Hatfield returned to work, Holloway did not raise the issue of the alleged theft or punish Hatfield in any way. (Id. at ¶ 70; Doc. No. 49 at ¶ 46). In his deposition, Holloway was asked whether the article might affect the public's trust in TDOC, and he responded, stating, "I can see where it would. But personally, I don't think so." (Doc. No. 50-5 at 17). The article remains online and accessible today. (Id. at ¶ 67).

The second comparator, Estes, is a black, male Correctional Captain. (Doc. No. 49 at ¶ 46). In June 2021, Estes was moonlighting as a security guard at a restaurant when his TDOC issued vehicle was struck by bullets fired outside of the night club located next-door. (Id. at ¶ 51). Estes was not in his TDOC uniform when the state's car was shot, or while providing security services at the restaurant. (Id. at ¶ 52). After the incident, Estes reported the incident to Holloway and completed a Police Incident Report. (Id. at ¶¶ 53–4). However, in doing so, he lied both to Holloway and on the incident report—stating that he was merely getting take-out

5

from the restaurant. (Id.). Ultimately, Estes received a five-day suspension and was stripped of the position Chief of Security in accordance with TDOC Index # 305.01. (Id. at ¶¶ 55–56). He did not receive a demotion of rank or any permanent loss of pass. (Doc. No 52 at ¶ 82).

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. Id.

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

Moreover, if, "after adequate time for discovery and upon motion," the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial[,]" a court should enter

summary judgment in favor of the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When this occurs, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. at 323 (citation an internal quotation marks omitted). Conclusory statements "unadorned with supporting facts are insufficient." Viet v. Le, 951 F.3d 818, 823 (6th Cir. 2020). Thus, if the nonmovant does not support the elements of a claim or defense, the moving party is entitled to judgment as a matter of law.

### III. ANALYSIS

When a plaintiff brings sex or gender discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and relies on circumstantial evidence, her claims must be evaluated in accordance with the framework enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See generally Wright v. Murray Guard, Inc., 455 F.3d 706 (6th Cir. 2006). Under the three-step burden-shifting framework for analyzing claims of employment discrimination under Title VII, a plaintiff must first set forth a prima facia case for discrimination. Newman v. Fed. Express Corp., 266 F.3d 401, 405 (6th Cir. 2001). The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. Id. If the employer carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretext for discrimination. Id. The Court will analyze TDOC's motion in step with this framework.

    a. Arnold's Prima Facie Case

To establish a prima facie case of discrimination under Title VII, Arnold must show that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected

7

class or was treated differently than similarly situated, non-protected employees. Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006).

At the outset, TDOC concedes that Arnold has satisfied the first three elements of a prima facie discrimination case, (Doc. No. 43 at 9), and Arnold does not claim that she was replaced by someone outside of her protected classes. (See generally Doc. No. 48 at 5–19). What's more, there is no dispute over whether the identified comparators—who both kept their jobs—received different treatment than Arnold. (Doc. No 52 at ¶¶ 70, 82). Thus, TDOC's Motion first turns on whether sufficient evidence exists to establish that either Hatfield or Estes are valid comparators.

To do so, the plaintiff must show that the offered comparators are similarly situated in all relevant respects. Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992); see also Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 777 (6th Cir. 2016). This does not require the comparators to "be identical in every way." Tennial v. United Parcel Serv., Inc., 840 F.3d 292, 304 (6th Cir. 2016). "The key is that the two employees are similar in all of the relevant aspects." Nolan v. Ohio Dep't of Rehabilitation & Correction, No. 21-4213, 2022 WL 17759905, at *5 (6th Cir. Dec. 18, 2022). The Sixth Circuit has noted that three relevant aspects are whether the two employees "'(1) dealt with the same supervisor; (2) have been subject to the same standards; and (3) have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 777 (6th Cir. 2016) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). However, at bottom, the Court "must make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the nonprotected employee' based on the facts of the case." Tennial, 840 F.3d at 304.

8

Based on the undisputed record evidence, each of the three relevant factors identified in Jackson are met: both Hatfield and Arnold dealt with the Holloway because Holloway had sole authority to fire DSNF correctional officers, (Doc. No. 49 at ¶ 20); both were subject to TDOC Policy 302.08, (Doc. No. Doc. No. 45-13 at 122–23); and both were accused of taking property that did not belong to them in violation of that policy—the proffered explanation for Arnold's termination. (Compare Doc. No. 49 at ¶¶ 21–23; with Doc. Nos. 49 at ¶¶ 36–37, 50-8 at 10).

TDOC argues that Hatfield—Arnold's only comparator for race discrimination—is distinguishable in several respects. (Doc. No. 43 at 10–13). To do so, TDOC highlights that Arnold and Hatfield had different direct supervisors, ranks, duties, experience, and longevity. (Id. at 10–11). But these distinctions in Arnold and Hatfield's employment miss the target. The only supervisor relevant to this case is Warden Holloway, who had sole authority to fire Arnold and Hartfield, (Doc. No. 49 at ¶ 20), and TDOC Policy 302.08 explicitly applies to all TDOC employees, as do the Oath and Code of Conduct. (Doc. No. Doc. No. 45-13 at 2–5, 122–23). TDOC also draws attention to Arnold's probationary employment status as reason to distinguish her from Hatfield, but this too does not pass muster. The case on which TDOC relies, Cooper v. City of North Olmsted, 795 F.2d 1265 (6th Cir. 1986), explains that probationary workers do not stand equal footing with permanent coworkers and cannot be considered similarly-situated because "a probationary period of employment permits a company to weed out or eliminate undesirable [new] employees." Cooper, 795 F.2d at 1270. But Arnold was far from a new employee; she had worked at DSNF since 2017 and was placed on probation following a promotion to Correctional Corporal. (Doc. No. 49 at ¶¶ 2, 4–5).

Next, TDOC lists two factors that it claims distinguish Hatfield's case from Arnold's. First, TDOC states that Hatfield was not in uniform when he under-rung his groceries. (Doc. No.

9

43 at 11). But in a footnote appended to that claim, TDOC acknowledges that "a certain Wal-Mart document indicates that Hatfield was in [a] Department uniform at the time." (Id. at n.6). At summary judgment, that document—Wal-Mart's "Case Information Sheet"—paired with a grainy, black and white photo of Hatfield (Doc. No. 50-8 at 3) allows for the inference that he was wearing at least some TDOC issued clothing. Second, TDOC states that Hatfield's incident was not posted to social media. (Doc. No. 43 at 11). But TDOC omits any explanation of how this is a distinguishing factor when Snopes: Nashville published an article about Hatfield's alleged shoplifting online. (See generally, Doc. Nos. 43, 51). Although the Court can assume that Facebook has greater traffic than Snopes: Nashville, TDOC does not take the next logical step of arguing that a video posted to Facebook for less than a day was a greater threat to TDOC's public image than an article that remains online today or that Holloway believed as much when he made each decision. (Id.).

Last, TDOC points to Hatfield's mental break and extended leave as a mitigating circumstance. (Doc. No. 43 at 12). The Court has no doubt that Hatfield's mental health was a mitigating factor. However, it cannot overlook that Hatfield's mental break took place days after Holloway saw the Snopes: Nashville article, (Doc. No. 52 at ¶ 69), when Arnold was fired the same day that Holloway saw the Facebook video and less than 24 hours after her indiscretion took place. (Doc. No. 49 at ¶¶ 18–19). Rather than establish that Holloway knew that Hatfield had been experiencing mental distress before the day he suffered his incident at DSNF, TDOC attempts to benefit from hindsight simply because the incident happened. The leniency Holloway afforded Hatfield immediately after discovering his misbehavior was not extended to Arnold; this cannot be attributed to Hatfield's subsequent breakdown based on the record evidence at summary judgment.

10

Ultimately, Arnold has provided sufficient evidence to establish a prima facia case for race and gender discrimination with Hatfield as a comparator.

The same cannot be said with regard to Estes. Granting every available inference to Arnold, the evidence very well may show that Estes lied to the Warden and in the Police Incident Report. However, Estes' indiscretion was entirely different than that of Arnold and Hatfield, and Arnold acknowledges as much. (See Doc. No. 48 at 18 ("Arnold acknowledges that Captain Estes may not have engaged in clearly criminal conduct like Hatfield.")). The circumstances of Estes case are also far from those in Arnold's. Arnold concedes that Estes was not in uniform when he was moonlighting as a security guard at the restaurant, (Doc. No. 49 at ¶ 52), and there is no evidence indicating that Estes was recorded taking property that did not belong to him from any store or that such a video was posted online. Likewise, there is nothing in the record that might suggest that Estes' actions could similarly allow the public to call Estes' or TDOC's integrity into question. This is not a close call.

### b. A Legitimate, Nondiscriminatory Reason for TDOC's Actions

After the plaintiff establishes her prima facie case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. Harris v. City of Akron, Ohio, 836 Fed. App'x 415, 419 (6th Cir. 2020). This is a burden of production; although the defendant need not persuade the Court that it was actually motivated by the proffered reasons, it must "present clear and reasonably specific reasons that will frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Id. (internal quotation marks and citations omitted). By producing evidence that Arnold was fired for violating TDOC Policy 308.02, TDOC has done exactly that. Arnold does not dispute that this is TDOC's alleged legitimate, nondiscriminatory reason for

11

Case 3:20-cv-01031   Document 87   Filed 01/05/23   Page 11 of 13 PageID #: 1610

firing her. (Doc. No. 48 at 14). Accordingly, the Court need not dwell on this stage of the burden shifting analysis for the purposes of this Motion. Harris, 836 Fed. App'x at 419.

  c. Pretext

"Once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, 'the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually pretext for unlawful discrimination.'" Jackson, 814 F.3d at 779 (quoting Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 812 (6th Cir. 2011)). "Notably, this burden on the plaintiff 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" Id. (quoting Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)). "Thus, on summary judgment, in evaluating pretext and the plaintiff's ultimate burden, the court should consider all probative evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage." Id. (quoting Provenzano, 663 F.3d at 812).

A plaintiff can demonstrate pretext by showing that the employer's proffered reason or the adverse action (1) was not based in fact; (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000). Here, Arnold only seeks to demonstrate pretext under the third method. (See Doc. No. 48 at 15 ("Arnold offers evidence that her policy infractions were 'insufficient to warrant' her termination as compared to Hatfield.")). Accordingly, the Court need not consider the first or second.

To prove that TDOC's alleged reason for firing Arnold was insufficient to warrant the challenged conduct, Arnold must offer evidence sufficient to prove that Hatfield was not fired even though he engaged in substantially identical conduct to that which TDOC contends

12

motivated Arnold's firing.  Jackson, 814 F.3d at 779–80.  This "substantially identical" standard does not require that Arnold meet a greater burden of proof; rather, it requires the Court to evaluate Arnold's similarity to her remaining comparator with increased rigor.  Id. at 780.

The Court was prepared to conduct this analysis, however, based on the Defendant's briefings, TDOC was not.  After laying out the relevant standard, in its opening brief, TDOC summarily states without citation or elaboration that Arnold did not offer evidence of pretext.  (See Doc. No. 43 at 15 ("Plaintiff did not have any rebuttal evidence when this matter was investigated by the EEOC.  Evidence produced in discovery does not show pretext.  Plaintiff's deposition testimony did not reveal any factors motivating TDOC's decision to terminate her aside from the theft.")).  In its reply brief, TDOC does not mention of pretext until the very last sentence.  (Doc. No. 51 at 6).  As the moving party, TDOC retains the burden on summary judgment to demonstrate an absence of evidence to support the non-moving party's case.  Rodgers, 344 F.3d at 595.  The Court will not pain itself to substantiate TDOC's bare assertions out of whole cloth.  Accordingly, it will treat this step in the burden-shifting framework as unopposed for the purposes of this motion.

## IV. CONCLUSION

For the foregoing reasons, TDOC's Motion for Summary Judgment (Doc. No. 42) will be denied.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE